IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BAXTER HEALTHCARE CORPORATION, BAXTER INTERNATIONAL INC., and BAXTER HEALTHCARE S.A., | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | Civil Action No. 13-6228 (JBS/KMW) |
| v. | |
| HQ SPECIALTY PHARMA CORPORATION, | **REDACTED** OPINION |
| Defendant. | |

APPEARANCES:

Robert D. Rhoad, Esq.
Brian M. Goldberg, Esq.
DECHERT LLP
902 Carnegie Center, Suite 500
Princeton, NJ 08540
      -and-
Kevin M. Flannery, Esq.
Vincent A. Gallo, Esq.
DECHERT LLP
Circa Centre
2929 Arch Street
Philadelphia, PA 19104
      Attorneys for Plaintiffs

Edward J. Dauber, Esq.
Thomas Slocum, Esq.
GREENBERG, DAUBER, EPSTEIN & TUCKER, PC
One Gateway Center, Suite 600
Newark, NJ 07102
      -and-
Richard D. Kelly, Esq.
Stephen G. Baxter, Esq.
Frank J. West, Esq.
Tia D. Fenton, Esq.
Lisa M. Mandrusiak, Esq.
Katherine D. Cappaert, Esq.
OBLON, MCCLELLAND, MAIER & NEUSTADT, L.L.P.
1940 Duke Street
Alexandria, VA 22314
      Attorneys for Defendant

SIMANDLE, Chief Judge:

## Table of Contents

I.   INTRODUCTION ............................................... 3

II.  BACKGROUND ................................................. 7

   A.  Factual and Procedural Background ...................... 8

      1.  Background to Esmolol Hydrochloride and Baxter's
      Innovative Esmolol Research ............................... 8

      2.  Mr. Owoo's Separation from Baxter .................... 14

      3.  Mr. Owoo's Initial Contact with HQ .................. 15

      4.  HQ's Development Agreement with Mr. Owoo's Welgrace
      Research Group ............................................ 19

      5.  HQ's Applications before the USPTO and FDA ........... 21

      6.  Litigation in this District .......................... 22

III. STANDARD OF REVIEW ........................................ 24

IV.  DISCUSSION ................................................ 25

   A.  Baxter Cannot Establish a Prima Facie Case of Tortious
   Interference with Contractual or Business Relationships ..... 25

   B.  Admissible Evidence May Establish a Prima Facie Case of
   HQ's Misappropriation of Trade Secrets ..................... 31

      1.  New Jersey's Trade Secrets Act, N.J.S.A. § 56:15-1, et
      seq., generally ........................................... 32

         a.  Genuine factual issues preclude a finding that Baxter's
         "trade secrets" constitute public information ........... 35

         b.  Genuine factual issues exist on whether HQ had Reason
         to Know that Mr. Owoo obtained Baxter's claimed "trade
         secrets" by Improper Means .............................. 40

   C.  Admissible Evidence May Establish a Prima Facie Case for
   HQ's Unjust Enrichment and/or Unfair Competition Claims ..... 41

   D.  Admissible Evidence May Establish a Prima Facie Case for
   Baxter's claims for Correction of Inventorship and to Quiet
   Title to HQ's Patents ..................................... 42

V.   CONCLUSION ................................................ 44

## I.   INTRODUCTION

In this action Plaintiffs Baxter Healthcare Corporation, Baxter International Inc., and Baxter Healthcare S.A. (collectively, "Baxter") assert three distinct series of claims arising out of Defendant HQ Specialty Pharma Corporation's (hereinafter, "HQ") New Drug Application (hereinafter, "NDA") for an esmolol premixed injectable bag product.  <u>First</u>, Baxter alleges that the esmolol product claimed in HQ's NDA infringes the formulation patents[1] covering Baxter's injectable esmolol product, BREVIBLOC®.[2]  <u>Second</u>, Baxter asserts an array of state law claims for tortious interference, misappropriation of alleged trade secrets, unjust enrichment, and unfair competition, all of which it premises upon HQ's employment of George Owoo, a former (now deceased) Baxter scientist and one of the named inventors on Baxter's Patents.[3]

---

[1] The esmolol patents asserted by Baxter issued in 2001 and 2003, and include U.S. Patent Nos. 6,310,094 (hereinafter, "'094 Patent") and 6,528,540 (hereinafter, "'540 Patent" and collectively, "Baxter's Patents").  Taken together, these patents teach a ready-to-use, injectable parenteral solution containing esmolol hydrochloride, a buffering agent, an osmotic-adjusting agent, and a method for its manufacture in a sealed container.  (<u>See</u> '094 Patent at 5:8-6:23; '540 Patent at 5:60-8:11.)

[2] The infringement claims will proceed to a bench trial before the undersigned on February 1, 2016.

[3] Mr. Owoo died on May 2, 2014 (<u>See</u> HQ's SMF at ¶ 40), and the factual record relative to Mr. Owoo remains sparse, perhaps as a result of the fact that Baxter did not propound its allegations related to Mr. Owoo's conduct until after his death.  As a

Third, and largely based upon the allegations underpinning its state law claims, Baxter seeks to designate Mr. Owoo as the sole inventor of the generic esmolol formulation embodied in HQ's esmolol patents (and its related NDA), and then to declare Baxter the true holder of the rights and interests protected by HQ's patents.[4]

This Court previously addressed the parties' cross-motions for summary judgment on the issue of patent infringement, see Baxter Healthcare Corp. v. HQ Specialty Pharma Corp., ___ F. Supp. 3d _____, 2015 WL 5646779 (D.N.J. Sept. 23, 2015), and now confronts HQ's motion for summary judgment on Baxter's state law tort and inventorship claims.[5]  Although dressed in different terms, the critical threads throughout each of these claims

result, the factual record relative to his conduct consists, almost exclusively, of testimony from HQ employees.
[4] HQ claimed its esmolol formulation in U.S. Patent Nos. 8,835,505 (hereinafter, the "'505 Patent") and 8,829,054 (hereinafter, the "'054 Patent"), both of which issued in September 2014.  Viewed together, HQ's Patents disclose a ready-to-use, injectable esmolol formulation that consists of esmolol hydrochloride, a buffering agent, a combination of ethanol and propylene glycol, and a pH adjuster, capable of being stored in a modified flexible plastic storage container.  (See '505 Patent at 15:61-18:41; '054 Patent at 15:61-18:41.)  In other words, HQ's proposed esmolol product purports to differ from Baxter's principally in terms of its specific composition and container.
[5] These state law tort and inventorship claims specifically include: (1) tortious interference with contract (count III), (2) tortious interference with prospective business relations (count IV), (3) misappropriation of trade secrets (count V), (4) unfair competition (count VI), (5) unjust enrichment (count VII), (6) correction of inventorship (count VIII), and (7) declaratory judgment and quiet title (count IX).  (See Second Am. Compl. at ¶¶ 76-139.)

concern Baxter's positions that HQ (knowingly or otherwise) built its proposed esmolol formulation (and obtained its patents) upon confidential information secreted from Baxter by Mr. Owoo (especially, a formulation "discovered" by Baxter during a 2009 study involving Mr. Owoo), and otherwise developed this product by interfering with Baxter's contractual relationship with Mr. Owoo (specifically, his Employment and Severance Agreements).

Critically, the parties do not genuinely dispute that Mr. Owoo's esmolol proposal to HQ (now substantially embodied in HQ's proposed formulation) closely resembles a formulation documented in a prior Baxter esmolol study.  Rather, in support of summary judgment, HQ takes the position that the factual record nowhere suggests that it played any role in any unlawful conduct relative to the unsolicited esmolol proposal Mr. Owoo brought to HQ on his own accord.  (See HQ's Br. at 1, 4-8, 16-26.)  In that way, HQ generally claims that it cannot be called to answer for Mr. Owoo's independent malfeasance, particularly because it allegedly engaged Mr. Owoo with the belief (1) that his proposal had no connection to any confidential Baxter information and (2) that he otherwise acted as a free agent unrestrained by any contractual obligations.  (See, e.g., id. at 24; see also HQ's Reply at 7-11.)  HQ further submits that its formulation came from publicly-available sources (namely, the

label for Baxter's own concentrated esmolol formulation from the 1980s), and not any information over which Baxter can legitimately claim trade secrecy protection.  (HQ's Reply at 1-3; see also HQ's Br. at 1-4, 10-12, 24-25.)

Baxter advances the position, by contrast, that, in working with Mr. Owoo, HQ simply turned a blind eye to the obvious Baxter-centric underpinning for Mr. Owoo's proposal, in order to fast track an esmolol product through its development pipeline. Mr. Owoo was an expert on esmolol product formulations at Baxter, who left Baxter and almost immediately proposed the new esmolol product to HQ, which had no prior esmolol experience. Indeed, because Mr. Owoo approached HQ with a "fully formed concept" for a "new" esmolol "bag product," Baxter alleges that he necessarily relied upon his "extensive knowledge of Baxter's confidential information," in order to place HQ on an expedited and unfair track to Food and Drug Administration (hereinafter, the "FDA") approval (and to competing with BREVIBLOC®). (Baxter's Opp'n at 1-3, 13-17, 23-30 (internal quotations omitted).)  As a result, Baxter submits that the factual record plainly supports an inference that HQ had at least reason to know that Mr. Owoo based his "new" product proposal upon information gleaned during his tenure at Baxter (and while working on Baxter's own esmolol formulations).  (See Baxter's Opp'n at 18-22.)

The factual record on the pending motion leaves little question that Mr. Owoo acted at best suspiciously and at worst unlawfully, in helping to develop rival esmolol formulations for both Baxter and HQ.  Nevertheless, the claims at issue here call upon the Court to determine whether HQ acted unlawfully relative to its esmolol product development, by either encouraging Mr. Owoo's conduct or by engaging Mr. Owoo despite his conduct of which HQ knew or should have known.  For purposes of this motion, the Court must consider whether the movant, HQ, is correct that the factual record is undisputed and that it can give rise to no reasonable inference of liability (or, triable issue of fact) on any or all of Baxter's state law claims.

For the reasons that follow, HQ's motion for summary judgment will be granted with respect to Baxter's tortious interference claims, but denied with respect to Baxter's remaining claims for misappropriation of trade secrets, unfair competition, unjust enrichment, and correction of inventorship.[6]

## II.   BACKGROUND[7]

---

[6] The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a).

[7] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to Baxter, as the party opposing summary judgment.  The Court disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent) and/or contain improper legal argument or conclusions.  See generally L. Civ. R. 56.1(a); see also Kemly

### A. Factual and Procedural Background

#### 1. Background to Esmolol Hydrochloride and Baxter's Innovative Esmolol Research

Esmolol hydrochloride acts as "a short-acting cardioselective beta-blocker used in treating acute cardiac disorders related to [an individual's] heart rate." (Clementi Rep. at ¶ 15; see also '094 Patent at 1:13–23.)  In other words, medical professionals use esmolol hydrochloride products for "rapid [and short term] control of the ventricular heart rate" during "perioperative, postoperative, or other emergent circumstances." (Clementi Rep. at ¶ 15.)

Baxter, a trailblazer in the esmolol industry, has "successfully commercialized various esmolol products under its BREVIBLOC® trademark" for over thirty years.[8] (Chaubal Dec. at ¶ 5; see also Baxter's Supp. SMF at ¶¶ 2-3, 97-100; Second Am. Compl. at ¶ 4.)  Indeed, in the late 1980s, Baxter obtained FDA approval to market two BREVIBLOC® products: (1) a "concentrated ampul product" containing esmolol, propylene glycol, ethanol, and water (and required dilution to the appropriate dosage strength); and (2) a "10 mg/mL small volume vial product"

---

v. Werner Co., ___ F. Supp. 3d ____, 2015 WL 8335030 (D.N.J. Dec. 8, 2015) (disregarding portions of the parties' statements of material facts); Jones v. Sanko Steamship Co., Ltd., ___ F. Supp. 3d ____, 2015 WL 8361745 (D.N.J. Dec. 8, 2015) (same).

[8] The parties do not dispute Baxter's pivotal role in commercializing esmolol products, nor that HQ's pending NDA amounts to its first foray into the esmolol market.

8

containing esmolol, a buffering agent, and water.  (Clementi Rep. at ¶¶ 17, 20; see also Baxter's Supp. SMF at ¶¶ 3-5.)

These early esmolol formulations,[9] however, suffered from "extreme susceptibility to hydrolytic degradation,"[10] limited if any resilience to sterilization by autoclaving,[11] and dilution errors by end users (resulting in patients receiving too much of the drug).[12]  ('540 Patent at 1:30-40; see also Chaubal Dec. at ¶¶ 7, 10-11; Clementi Rep. at ¶ 19.)  In order to address these issues, Baxter "extensively" researched esmolol formulations through an array of scientists, including Mr. Owoo,[13] with an eye towards developing a ready-to-use bag product (i.e., one that did not need to be diluted prior to administration) that could be terminally sterilized via autoclaving (as opposed to aseptic

---

[9] Generally speaking, esmolol hydrochloride (the active pharmaceutical ingredient of any esmolol product) constitutes one type of "beta-blocker," a class of drugs that block the "beta" receptor of heart muscles, arteries, and certain other tissue.  ('094 Patent at 1:13-23.)

[10] In other words, these prior esmolol forms disintegrated in water.  (See Baxter's Supp. SMF at ¶ 10.)

[11] Autoclaving refers to a process that sterilizes a manufactured product after the composition has been made and put into its packaging.  (See Clementi Rep. at ¶ 18 n.1.)  Aspectic sterilization (as required for early esmolol forms), by contrast, involves making the product and filling it into its packaging in a sterile environment.  (See id.)

[12] Indeed, Baxter withdrew its BREVIBLOC® concentrate ampul product, largely on account of these issues.  (See Baxter's Supp. SMF at ¶ 7.)

[13] Mr. Owoo's formal employment relationship with Baxter began on March 19, 1998 (see Ex. DD to Kelly Dec.; see also Ex. 6 to Gallo Dec.; Baxter's Supp. SMF at ¶ 50), although his informal consultative work appears to date back to September 1, 1994.  (See Ex. 7 to Gallo Dec.)

manufacturing).[14]   (Baxter's Supp. SMF at ¶¶ 14-18; see also
Clementi Rep. at ¶¶ 21, 41; Chaubal Dec. at ¶¶ 10-11, 26.)

Through this research, Baxter claims to have solved these
problems, and developed a ready-to-use aqueous esmolol
formulation capable of sterilization by autoclaving.  ('094
Patent at 2:1-14; '540 Patent at 2:1-14.)  Indeed, in contrast
to the prior art, the claimed formulations prove "stable against
hydrolytic degradation and other adverse chemical reactions,"
and possess "a pharmaceutically-acceptable shelf-life."  ('094
Patent at 2:3-5.)  Mr. Owoo's early efforts in connection with
these BREVIBLOC® projects led to him being identified as a named
inventor on the BREVIBLOC® formulation and method of preparation

---

[14] During this period, Baxter alleges that Mr. Owoo had access
to, and helped develop, confidential esmolol information
concerning: "formulation research, product test methods and
research reports; manufacturing processes, in-process controls,
release specifications, and impurities profiles; product
stability testing and data; clinical research strategies;
regulatory proceedings; marketing and commercial strategies,
competitive analyses, [] new product development" information,
and the full panoply of Baxter's "confidential FDA materials."
(Chaubal Dec. at ¶¶ 10-12.)  Beyond this, however, Baxter
provides little if any detail concerning the exact nature and
classification of Mr. Owoo's employment.  Rather, the record
developed by Baxter simply states, without documentary evidence,
that Mr. Owoo would have had knowledge of, access to, and been
involved in, an array of activities relative to Baxter's
confidential information.  (See, e.g., Chaubal Dec. at ¶¶ 10-11,
26.)  Moreover, although he appears listed on many of Baxter's
documents (aside from Baxter's Patents), his name never appears
to bear a title and was ordinarily included amongst an array of
Baxter employees.  (See, e.g., Ex. 25 to Gallo Dec. (listing Mr.
Owoo as one of multiple "bcc" recipients).)

patents[15] presently at issue.[16]  (See generally '094 Patent; '540 Patent.)

---

[15] The claims of Baxter's patents are, as explained above, directed at a specific esmolol composition and a method for preparing and sterilizing the composition in a sealed bag.  (See generally '094 Patent at 5:8-6:23; '540 Patent at 5:55-8:11.) Baxter currently markets this invention as a "large volume ready-to-use" product packaged in flexible intravenous bags in two dosage strengths (10 mg/mL in a 250 mL bag and 20 mg/mL in a 100 mL bag).  (See Clementi Rep. at ¶¶ 15, 21.)

[16] HQ takes issues with Baxter's characterization of Mr. Owoo as a "'technical lead'" for its "esmolol projects."  (HQ's SMF at ¶ 80 (citing Second Am. Compl. at ¶ 40) (arguing that "[n]o document produced by Baxter in this litigation identifies George Owoo as 'technical lead'").)  Nevertheless, Baxter's Vice President for Product Quality, Dr. Chaubal described Mr. Owoo as "one of the technical leaders of all Brevibloc esmolol products for many years prior to his departure in 2010" (Chaubal Dec. at ¶ 10), and Mr. Owoo's status as a named inventor on Baxter's patents plainly reflects the depth of his esmolol involvement while at Baxter.  (See, e.g., '094 Patent.)



The

report itself prominently identifies its content and the data
underlying its findings (laboratory notebooks, and the like) as
"**BAXTER CONFIDENTIAL.**"  (Attachment E. to Chaubal Dec.; <u>see also</u>
Baxter's Supp. SMF at ¶ 24.)



████████████████████

████████ and Mr. Owoo's employment with Baxter officially ended on February 12, 2010.[20]  (Ex. 7 to Gallo Dec.)

### 2. Mr. Owoo's Separation from Baxter

As part of his severance agreement, Baxter paid Mr. Owoo "valuable consideration" in exchange for Mr. Owoo's reaffirmation of his obligation not to "disclose, use, or share any confidential, non-public information of the Company that [he] acquired during the course of his[] employment with the Company with/to any third party without [Baxter's] prior written consent," as well as his agreement to "honor and continue to abide by all obligations set forth in [his] Employment Agreement."  (Id. at ¶ 6(f); see also Baxter's Supp. SMF at ¶ 55.)  The Employment Agreement, in turn, required Mr. Owoo to forever "preserve as confidential" any non-public "information relating to the present or planned business of Baxter,"[21] and

---

████████████████████ (Clementi Rep. at ¶¶ 48-49.)

[20] Although Baxter and Mr. Owoo executed a severance agreement on February 12, 2010 (thereby marking the official conclusion of Mr. Owoo's employment), the record suggests that Mr. Owoo discontinued his work with Baxter prior to execution of the severance agreement.  (See, e.g., HQ's SMF at ¶ 2.)  Indeed, the signature page for Study No. 47192 suggests that Mr. Owoo left Baxter some time before January 22, 2010.  (See Attachment E to Chaubal Dec.)

[21] Confidential Information within the meaning of the Employment Agreement includes "Trade Secrets, Inventions, know-how and products," research and development projects and findings,

14

forbade him from using or disclosing this information even upon termination of his employment.[22]  (Ex. 6 to Gallo Dec. at ¶¶ 1(c), 4, 5; see also Ex. DD to Kelly Dec.)  In consequence of the confidential exchange inherent in this employment, the Agreement further precluded Mr. Owoo from working for a competing organization within one year after termination of his employment with Baxter, if such employment "potentially involve[d] the disclosure or use of" Baxter's confidential information.  (Ex. 6 to Gallo Dec. at ¶ 5.)  In other words, the Employment Agreement contained a prototypical non-compete provision that limited his ability for one year to accept certain employment upon his departure from Baxter.  (See generally id.)

### 3. Mr. Owoo's Initial Contact with HQ

Around the time of his termination,[23] Mr. Owoo contacted James Richard, then Vice President of Strategic Development for Interchem Corporation (an affiliate of HQ), about potential job opportunities.  (See Richard Dep. at 111:24-112:2; HQ's SMF at

---

designs, formulations, processes, methods of manufacture, and cost and pricing date.  (See Ex. 6 to Gallo Dec. at ¶¶ 1(c), 5.)
[22] In other words, the Agreement imposed a duty of confidentiality in perpetuity.  Nevertheless, it expressly excluded "publicly known" information from the scope of its provisions.  (Ex. 6 to Gallo Dec. at ¶ 4.)
[23] The record fails to disclose the actual date of this initial conversation with any degree of precision.  Indeed, the parties have not stated a clear timeline of these early events.  Nevertheless, the Court has recited the sequence of events based upon the parties' lengthy submissions.

¶¶ 1-2; Baxter's SMF at ¶¶ 1-2.)  Mr. Richard, in turn,
encouraged Mr. Owoo to contact Joseph Pizza, then President of
HQ, a small pharmaceutical company with no prior experience with
esmolol products.  (See Richard Dep. at 112:1-5; see also
Squeglia Dep. at 142:21-24; Clementi Rep. at ¶ 36.)

    As a result, Mr. Owoo approached HQ (through Mr. Richard)
in late February 2010, that is, within two or three weeks of his
separation from Baxter and about a month after the signing of
Baxter's Study No. 47192, above, on January 22, 2010.  Mr. Owoo
presented HQ with a proposal to develop a ready-to-use and "non-
infringing" "alternative" formulation of BREVIBLOC®, comprised of
a specific formulation ████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████.  (Richard Dep. at 121:8-126:6, 144:19-146:5; Exs. B &
██ H to Kelly Dec.; see also Baxter's Supp. SMF at ¶¶ 61-64.)

    In connection with this proposal, Mr. Owoo provided Mr.
Richard with "financial models" and a "value proposition for
esmolol" under the heading of Mr. Owoo's wholly-owned and
controlled company, Welgrace Research Company (hereinafter,
"Welgrace").  (Exs. B, D, & E to Kelly Dec.; see also Second Am.
Compl. at ¶ 6; Baxter's SMF at ¶ 31.)  Although Mr. Richard knew

16

that Mr. Owoo had worked on BREVIBLOC® (i.e., esmolol) products
while at Baxter,[24] Mr. Owoo allegedly informed Mr. Richard that
his new product proposal "had nothing to do with [any] Baxter
product" and did not rely upon "any Baxter information."[25]
(Richards Dep. at 104:7-14, 133:23-134:19.)   Mr. Richard claims
he spoke with Mr. Owoo with the impression (1) that he had no
non-compete obligations (see id. at 136:7-22) and (2) that Mr.
Owoo had "sufficient information on the history" of esmolol
products to put a new product "together without any confidential
information from Baxter."[26]   (Id. at 142:18-22.)

Shortly after these early conversations, Mr. Richard left
Interchem (see Richard Dep. at 144:19-21), and Mr. Owoo
contacted HQ's Vice President of New Product Development,

_____

[24] Indeed, years prior to his departure from Baxter, Mr. Owoo
emailed Mr. Richard a marketing presentation for the BREVIBLOC®
product portfolio.  (See Ex. F to Kelly Dec.)  Nevertheless, the
parties do not dispute that Mr. Richard did not solicit this
presentation, and that Mr. Owoo "[a]t times" sent "Mr. Richard
unsolicited emails asking him to review public presentations for
review and editing."  (HQ's SMF at ¶¶ 85-88; Baxter's SMF at ¶¶
85-88 ("Not Disputed").)
[25] For purposes of the pending motion, the Court will consider
Mr. Owoo's statements.  Nevertheless, the Court is doubtful that
these statements would be admissible for the truth of the matter
asserted under Federal Rule of Evidence 804(b).
[26] Baxter, of course, disputes that Mr. Owoo could have developed
his proposed esmolol product without using its confidential
information.  (See, e.g., Baxter's SMF at ¶ 15.)  Indeed, Baxter
claims that Mr. Owoo could not possibly have come "to HQ with a
fully formed concept," without "using the confidential trade-
secret information that Owoo learned about the Formulation 4
premix bag concept and other esmolol products during his time at
Baxter."  (Baxter's Opp'n at 14-15.)

Michele Scrofani, in order to continue marketing his proposals for esmolol. (See Ex. H to Kelly Dec.; see also HQ's SMF at ¶ 19; HQ's SMF at ¶ 19.) As part of this communication, Mr. Owoo provided a revised value proposition for his "new" 10 mg/mL ready-to-use esmolol formulation,[27] along with a "non-infringement explanation" that identified expired patents, i.e., public information, as the source of the proposed formulations.[28] (Ex. H to Kelly Dec.; see also HQ's SMF at ¶¶ 21-22.) In other words, Mr. Owoo's proposal readily identified Baxter's patents as the relevant prior art,[29] and purported to point out possibilities for a new esmolol formulation with improved stability.[30] (See Ex. H to Kelly Dec.; see also Squeglia Dep. at 143:5-11.) Ms. Scrofani, in turn, forwarded the proposal to

---

[28] Baxter acknowledges the documents, but again states that Mr. Owoo's proposal rested upon "Baxter's confidential information," and challenges Mr. Owoo's characterization of his proposed product as "'non-infringing.'" (Baxter's SMF at ¶ 22.) Baxter does not, however, dispute that Mr. Owoo nevertheless presented the product as sourced from public information. (See id.)

[29] For that reason, the Court finds no genuine dispute that HQ knew of Baxter's esmolol patents prior to and during their discussions with Mr. Owoo, although it appears that it may not have initially known of Mr. Owoo's actual involvement relative to those patents. (See Squeglia Dep. at 148:7-149:25; see also Baxter's SMF at ¶ 23.)

[30] Indeed, Mr. Owoo's proposal contained a diagram, comparing Baxter's BREVIBLOC® formulation to Mr. Owoo's proposed esmolol form. (See Ex. H to Kelly Dec.)

Jeanne Squeglia, another HQ Vice President, who then managed
HQ's relationship with Mr. Owoo.  (See Ex. H; Squeglia Dep.)

> ### 4. HQ's Development Agreement with Mr. Owoo's Welgrace Research Group

Following a series of additional exchanges and testing,[31] HQ
entered into a "**DEVELOPMENT AND LICENSE AGREEMENT**" with Welgrace
on December 1, 2011, for the purposes of further developing and
manufacturing an "[e]smolol premix" in 250 mL and 100 mL bags.
(Ex. K to Kelly Dec. at 1, 19.)  In connection with this
agreement, Welgrace (and by derivation, Mr. Owoo) represented
that its proposed product did "not misappropriate or infringe
the intellectual property rights of any other persons."  (Id. at
¶ 5.1.2.)  In other words, the agreement put to ink the claimed
novelty of the esmolol formulation, a position allegedly
advanced by Mr. Owoo since his initial conversations with Mr.
Richard in early 2010.  (See id.)  HQ claims it relied upon Mr.
Owoo's representations in contracting with Welgrace.  (See Pizza
Dep. at 169:21-170:23.)

---

[31] In the interim, various researchers from HQ (and its
affiliates) performed a panel of osmolality and stability tests
relative to Mr. Owoo's proposal.  (See, e.g., Ex. C to Kelly
Dec.)  As relevant here, Erica Castagna produced a chromatogram
for esmolol—work which later resulted in Ms. Castagna's listing
as a co-inventor on HQ's patents.  (See Ex. C to Kelly Dec.;
Squeglia Dep. at 174:19-175:22; Ex. 29 to Gallo Dec. (explaining
that HQ "would like to include Erica as an additional inventor
on the patent ... [as] a courtesy" for the work she generated).)

Nevertheless, at some point following execution of the Agreement, Ms. Squeglia developed some concern that Mr. Owoo may have used confidential information from Baxter in support of HQ's production of an esmolol product (or, that he may have violated contractual restrictions). (See Squeglia Dep. at 150:9-19.) As a result, she shared her concerns with Mr. Pizza, and called Mr. Owoo, who reiterated that HQ had no cause for concern. (Id. at 151:4-14.) Ms. Squeglia then contacted HQ's outside counsel in late April 2012 (id. at 153:2-11), and notified Mr. Owoo to expect a call from HQ's counsel concerning "some questions on Esmolol." (Ex. I to Kelly Dec.) During his conversation with HQ's counsel, Mr. Owoo again allegedly offered his assurances "that he ha[d] no existing relationship with Baxter labs; [that] he did not sign anything preventing him from working on [the proposed esmolol technology], including a non-compete; and [that] he ha[d] no reason to believe his prior relationship with Baxter prevent[ed] him from moving forward with [the proposed esmolol] project and having the requisite rights."[32]  (Ex. J to Kelly Dec.)  As a result, HQ proceeded with its development of the esmolol formulation, and placed itself on the path to FDA approval and USPTO patent issuance.

---

[32] The Court will again consider these statements subject to the concerns expressed underlined supra.

### 5. HQ's Applications before the USPTO and FDA

More specifically, in March and August of 2013, HQ and Welgrace filed patent applications, entitled "READY-TO-USE CO-SOLVENTS PHARMACEUTICAL COMPOSITION IN MODIFIED FLEXIBLE PLASTIC CONTAINER."[33] (See, e.g., Exs. M & N to Kelly Dec.) HQ then requested FDA approval to sell an injectable esmolol formulation in 10 mg/mL and 20 mg/mL dosage forms, prior to the expiration of Baxter's patents. (See Ex. Q to Kelly Dec.) Although BREVIBLOC® and HQ's proposed products constitute ready-to-use parenteral formulations containing esmolol hydrochloride as the active ingredient, the products differ (on the surface, at least) in their remaining composition. The BREVIBLOC® product taught by Baxter's patents, for example, discloses an esmolol formulation comprised of (1) esmolol hydrochloride, (2) a buffering agent, and (3) an osmotic-adjusting agent, all in a premixed and injectable form. (See, e.g., '094 Patent at 5:8-16.) █████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[33] The USPTO issued Notices for Allowance of these patents July of 2014, and they formally issued in September of 2014. (See Exs. O, P, Y, HH to Kelly Dec.)

███████████████   (<u>See</u> Ex. Q to Kelly Dec.)

For that reason, among others, HQ's September 5, 2013 Paragraph IV Certification detailed its position on noninfringement of Baxter's patents, as well as its contention that HQ's product rested upon expired patents and product labels of previously marketed esmolol formulations.  (<u>See</u> HQ's SMF at ¶¶ 35-36; <u>see also</u> Ex. Q to Kelly Dec.)

### 6. Litigation in this District

As a result of HQ's NDA filing, Baxter filed this patent infringement action on October 18, 2013 against <u>only</u> HQ.  (<u>See generally</u> Compl.)  In its March 11, 2014 initial disclosures, HQ identified Mr. Owoo as one of two individuals with knowledge of the "[d]rafting and submission" of HQ's NDA, as well as the underpinning "research and development" of HQ's "esmolol formulation."  (Ex. R to Kelly Dec.)

Three months after these disclosures,[34] Baxter filed an Amended Complaint, in which it asserted a number of state law tort and trade secret claims, arising from the fact that Mr. Owoo purportedly assisted HQ, "unbeknownst to Baxter," in developing its esmolol product by disclosing "highly valuable and competitively sensitive confidential information and trade secrets" in direct contravention of his contractual

---

[34] In the interim, Mr. Owoo died on May 2, 2014.  (<u>See</u> HQ's SMF at ¶ 40.)

22

nondisclosure and non-compete obligations.  (See Am. Compl. at ¶¶ 40-47, 58-89.)  In connection with these allegations, Baxter attached and produced, seemingly for the first time,[35] Mr. Owoo's Employment and Severance Agreements.  (See Exs. C & D to Am. Compl.)

On January 16, 2015, Baxter filed a Second Amended Complaint, asserting the same series of claims directly against Welgrace, the Estate of George Owoo, and Janet Fenning-Owoo in her capacity as Administrator of Mr. Owoo's Estate and as Vice President of Welgrace.[36]  (See generally Second Am. Compl.)  In connection with the parties' supplemental interrogatories upon this amended pleading, Baxter identified, for the first time, the three pieces of information allegedly misappropriated and provided to HQ—the esmolol formulation, Baxter's quality control protocol for measuring impurities in the concentrated esmolol formulation, and Baxter's osmolality measurements, all of which

_____

[35] Baxter does not genuinely dispute that Mr. Richard, Ms. Squeglia, and Mr. Pizza all testified to no prior knowledge of Mr. Owoo's contractual obligations.  Rather, Baxter advances the position, throughout its briefing, that the statements of HQ's own employees are "simply implausible," given Mr. Owoo's recent specialized prior employment with "a large pharmaceutical company such as Baxter."  (Baxter's SMF at ¶ 43.)  In other words, Baxter argues, in essence, that HQ (and its employees) ignored the obvious existence of employment agreements characteristic of the restrictions on scientists employed in pharmaceutical development.  (See id. at ¶ 44.)
[36] On July 20, 2015, however, Baxter voluntarily dismissed its claims against these additional Defendants.  [See Docket Item 178.]

Mr. Owoo (and by derivation, HQ) allegedly obtained in the months before leaving Baxter.  (See Ex. X to Kelly Dec. at 15-25; Baxter's Supp. SMF at ¶¶ 63, 65-71, 80-85.)

After reassignment of this case to the undersigned, this Court decided the parties' cross-motions for summary judgment on the issue of patent infringement, Baxter Healthcare Corp., ___ F. Supp. 3d ____, 2015 WL 5646779, and HQ's pending motion followed.

### III. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Alabama v. North Carolina, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted); see also FED. R. CIV. P. 56(a).

In evaluating HQ's motion for summary judgment, the Court must view the material facts in the light most favorable to the non-moving party, here Baxter, and make every reasonable inference in that party's favor.  See Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).  An inference based upon "'speculation or conjecture,'" however, "'does not create a material factual dispute sufficient to defeat summary judgment.'"  Halsey, 750 F.3d at 287 (citations omitted).  Rather, the non-moving party must support

24

each essential element with concrete record evidence.  <u>See</u>
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

"Where the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party," the
Court may grant summary judgment.  <u>Matsushita Elec. Indus. Co.,</u>
<u>Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## IV.  DISCUSSION

Baxter asserts, as explained above, various state law tort
and inventorship claims directed at the circumstances giving
rise to HQ's proposed esmolol formulation, as well as the
composition itself.  The Court will address each claim, in turn.

### A.  Baxter Cannot Establish a Prima Facie Case of Tortious Interference with Contractual or Business Relationships

In its claims for tortious interference (Counts III & IV),
Baxter argues that, in developing a competing esmolol
formulation, HQ wrongfully interfered with Mr. Owoo's
obligations under the Severance and Employment Agreements, and
with Baxter's reasonable expectation for prospective business
relationships.  (<u>See</u> Second Am. Compl. at ¶¶ 75-91.)  In support
of these claims, Baxter advances arguments about its
distribution of BREVIBLOC® bags, potential price erosion of
BREVIBLOC® in the event HQ's competing product reaches the
market, and its position that HQ had at least reason to know of
(or to suspect) Mr. Owoo's contractual obligations.  (<u>See</u>

25

Baxter's Opp'n at 23-26.)  Nevertheless, Baxter's positions rely upon speculation of the sort routinely deemed insufficient to create a genuine factual issue, and for that reason, the Court finds summary judgment on these claims appropriate.

In order to prevail on tortious interference claims under New Jersey law,[37] Baxter must establish four elements: (1) a protected interest—either a prospective economic or contractual relationship; (2) malice, i.e., intentional interference without justification;[38] (3) a reasonable likelihood that the interference caused the loss of the (prospective economic or contractual) gain; and (4) resulting damages.[39]  See, e.g., N.J.

---

[37] Because the claimed tortious activity took place in this forum, the parties agree that New Jersey law governs these claims.  (See HQ's Br. at 16 n.8 (applying New Jersey law); Baxter's Opp'n at 23-26 (same).)

[38] Malice in this context "does not require ill will," but instead means that the defendant intentionally inflicted harm "without justification or excuse."  DiGiorgio Corp. v. Mendez & Co., 230 F. Supp. 2d 552, 564-65 (D.N.J. 2002) (citation omitted).  "New Jersey courts have long understood [this] inquiry to focus on whether [the] defendant's actions amounted to 'sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated.'"  Id. at 565 (citations omitted).  In other words, the analysis hinges upon an evaluation of whether the defendant's conduct bespeaks an improper motivation or intention.  See generally id.  In this instance, however, Baxter points to no such conduct, as explained below.

[39] In that way, tortious interference with contract differs from tortious interference with a prospective economic benefit, only in terms of the contractual element.  See Graco, Inc. v. PMC Global, Inc., No. 09-1304, 2009 WL 904010, at *19-*20 (D.N.J. Mar. 31, 2009) (explaining that a claim for tortious interference with contract requires only "the additional element of a contract").  Given this substantive identity, coupled with

26

Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc.,
___ F. Supp. 3d _____, No. 12-5610, 2015 WL 5822930, at *8
(D.N.J. Oct. 1, 2015) (citations omitted); Cargill Glob. Trading
v. Applied Dev. Co., 706 F. Supp. 2d 563, 575 (D.N.J. 2010)
(citations omitted); Matrix Essentials, Inc. v. Cosmetic
Gallery, Inc., 870 F. Supp. 1237, 1246 (D.N.J. 1994), aff'd, 85
F.3d 612 (3d Cir. 1996).

Regarding tortious interference, the Court need address
only the "malice" element, because the record amassed by the
parties falls far short of demonstrating the intentionality
necessary for purposes of Baxter's tortious interference claims.
Under New Jersey law of tortious interference, the notion of
"malice" requires that the defendant acted intentionally with
respect to a known contractual duty of another; it does not
suffice that a defendant "should have known" of the contractual
relationship, because one cannot act with intent to interfere
with a contract unless that contract is actually known.  See,
e.g., Lamorte Burns & Co. v. Walters, 770 A.2d 1158, 1170 (N.J.
2001) (explaining, in the context of tortious interference, that
"malice" means that "harm was inflicted intentionally and
without justification or excuse"); Printing Mart-Morristown v.
Sharp Elecs. Corp., 563 A.2d 31, 37 (N.J. 1989) (same); Vosough

the fact that these claims fail for substantially the same
reason, the Court will address these claims together.

v. Kierce, 97 A.3d 1150, 1160 (N.J. Super. Ct. App. Div. 2014).
In this respect, the degree of a defendant's knowledge of the
existence of its employee's contractual obligation to the
previous employer for purposes of tortious interference (i.e.,
actual knowledge) is greater than what is required for the
analogous tort of misappropriation of trade secrets that are
protected by the employee's contractual obligation to the
previous employer (i.e., that the defendant knew or had reason
to know of the existence of the contract protecting trade
secrets), as discussed further in Part IV.B, below.  In the
present case, there is no evidence from which Baxter could prove
to a reasonable factfinder that HQ had actual knowledge of Mr.
Owoo's obligations under the Severance and Employment
Agreements.  There is no evidence, for example, that HQ had
actual knowledge of Baxter's contractual restrictions upon
scientists such as Owoo, let alone knowledge of the pertinent
Baxter/Owoo agreements, as now discussed.

     Baxter's evidence on the issue of malice amounts to little
more than its position that HQ necessarily encouraged Mr. Owoo
to violate his obligations to Baxter and "paid him for the
specific purpose of developing a generic version" of Baxter's
BREVIBLOC® products "that he and others invented while at
Baxter." (Baxter's Opp'n at 25.)  Even if these assertions are

correct, the evidence does not demonstrate that HQ knew these obligations actually existed.

To the contrary, the HQ employees with direct contact with Mr. Owoo (Mr. Richard, Ms. Squeglia, and Mr. Pizza) all testified that they made inquiry into Mr. Owoo's contractual obligations (on their own and through HQ's counsel) as discussed above, and otherwise had no knowledge of Mr. Owoo's Employment and Service Agreements prior to the filing of Baxter's amended pleading.[40] (See, e.g., Richard Dep. at 133:23-134:19, 142:2-22; Squeglia Dep. at 150:9-151:11, 155:21-24, 156:6-18; Pizza Dep. at 159:5-13, 169:4-7.) Indeed, the evidence on this point is that Mr. Owoo repeatedly represented that he had no outstanding contractual obligations with Baxter, and that his proposed esmolol formulation rested upon publicly available and/or non-confidential sources.[41] (See, e.g., Ex. H to Kelly Dec.; see

---

[40] Although Baxter advances the position that HQ should have known that a "sophisticated pharmaceutical company," like Baxter, would have required contractual arrangements, what HQ "should have known" is not sufficient for a tortious interference claim, as discussed above. Beyond this, Mr. Richard, the only deponent to have touched upon this issue, testified that he was not aware of such contractual agreements for Mr. Owoo and that the industry "standard" only required such agreements at "very high levels." (Richard Dep. at 136:7-22.) Baxter's argument to the contrary sounds only in negligence and poor judgment, not intentional and/or malicious conduct. See DiGiorgio Corp. v. Mendez & Co., 230 F. Supp. 2d 552, 559 (D.N.J. 2002) (explaining that "'malice' implies conduct more egregious and blameworthy than mere negligence").

[41] Under New Jersey law, HQ may rely upon Mr. Owoo's representations concerning the source of his esmolol

also Richard Dep. at 142:2-22 (explaining that Mr. Owoo "had
sufficient information" on esmolol to put together his proposed
formulation without the benefit of "any confidential information
from Baxter").)   In that way, the record contains no evidence
from which a reasonable factfinder could conclude that HQ
engaged Mr. Owoo with a desire to harm Baxter or otherwise to
interfere with its contractual and business relationships.[42]

Against that backdrop, the record, viewed in the light most
favorable to Baxter, creates no reasonable inference that HQ
acted with malice or with the intention of interfering with
Baxter's contractual and business relationships.[43]   See Lightning

---

formulation, and Mr. Owoo's contractual or fiduciary duty to
safeguard confidential information is not automatically imputed
to HQ, his subsequent employer.   See Givaudan Fragrances Corp.
v. Krivda, No. 08-4409, 2013 WL 5781183, at *5 (D.N.J. Oct. 25,
2013) (citation omitted).   In other words, New Jersey law does
not "impose a duty of independent inquiry upon an employer,"
like HQ, particularly when "faced with an otherwise unremarkable
representation by a prospective employee," like Mr. Owoo, that
his claimed formulation constituted his own.   Fox v. Millman, 45
A.3d 332, 346-47 (N.J. 2012).
[42] To the contrary, on the one instance in which HQ confronted
Baxter data, HQ expressly refused to rely upon it.   (See Ex. C
to Kelly Dec. (explaining that HQ must rerun an osmolality test,
because it could not use Baxter testing data provided by Mr.
Owoo).)
[43] The Court finds Baxter's reliance upon Med Alert Ambulance,
Inc. v. Atlantic Health Systems, Inc., No. 04-1615, 2007 WL
2297335 (D.N.J. Aug. 6, 2007) misplaced.   (See Baxter's Opp'n at
26.)   Critically, the Med Alert Ambulance court only found a
genuine issue on the defendants' malice and knowledge, because
the court had already determined that the defendants engaged in
a "tying arrangement" that could not "have been for the public
good, as a matter of law."   Id. at *15.   Baxter has identified
no similar arrangement, much less proffered any actual evidence

Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1170 (3d Cir. 1993)
(finding it "axiomatic that a defendant cannot be liable for
interfering" with an unknown contract); Matrix Essentials, Inc.,
870 F. Supp. at 1248-49 (finding evidence only of an effort to
sell products, and rejecting tortious interference claims);
Syncsort Inc. v. Innovative Routines Int'l, Inc., No. 04-3623,
2008 WL 1925304, at *19 (D.N.J. Apr. 30, 2008)(granting summary
judgment to the defendant, where its actions amounted to
"nothing more than healthy and legal competitive behavior").
Stated differently, the Court finds that Baxter has not offered
any evidence from which a reasonable factfinder could conclude
that HQ maliciously and intentionally interfered with Baxter's
business and contractual relationships.  As a result, HQ's
motion for summary judgment on Baxter's tortious interference
claims will be granted.

   **B.   Admissible Evidence May Establish a Prima Facie Case
        of HQ's Misappropriation of Trade Secrets**

   Baxter's claim for misappropriation of trade secrets (Count
V) hinges upon its position that Mr. Owoo used Baxter's trade
secrets in order to develop their proposed esmolol bag product,
and that HQ knew or had reason to know of Mr. Owoo's "theft of
Baxter's trade secret information."  (Baxter's Opp'n at 13-23;
see also Second Am. Compl. at ¶¶ 92-102.)  In support of these

─────────────────────────────

(as opposed to speculation) of conduct intended by HQ to harm
Baxter.

positions, Baxter points to the temporal proximity between Mr.
Owoo's termination from Baxter and his presentation of a nearly
fully-formed esmolol proposal to HQ (as evidence that Mr. Owoo
necessarily relied upon Baxter's confidential trade-secret
information), and claims under these circumstances that HQ
"ignor[ed] the obvious when warning bells should have been going
off in [its] halls." (Baxter's Opp'n at 14-15, 20.) HQ, by
contrast, takes the position that Baxter publicly disclosed its
claimed trade secrets, and submits, in any event, that it did
not know or had no reason to know that Mr. Owoo acquired the
alleged trade secrets through improper means. (See HQ's Br. at
24-26; HQ's Reply at 3-11.) Given these positions, the Court
will first summarize the relevant framework for trade secrecy,
prior to turning to the factual record relative to Baxter's
misappropriation claim.

### 1. New Jersey's Trade Secrets Act, N.J.S.A. § 56:15-1, et seq., generally

The New Jersey Trade Secrets Act, N.J.S.A. § 56:15-1, et
seq. (hereinafter, the "Act"), prohibits the actual or
threatened misappropriation of a "trade secret."[44] N.J.S.A. §
56:15-3. A "trade secret," in turn, means "information" that

---

[44] Although New Jersey did not promulgate the Act until January
5, 2012, New Jersey enacted it as a distillation of the
developed common of trade secrecy, and both parties apply its
provisions to Baxter's misappropriation claim. (See, e.g., HQ's
Br. at 22; Baxter's Opp'n at 13 n.3.) The Court will conform
its discussion accordingly.

(1) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and (2) that the holder reasonably endeavors to maintain as confidential.[45] N.J.S.A. § 56:15-2.  The Act then defines misappropriation of a qualifying trade secret to include:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that a person acquired the trade secret by improper means;[46] or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent of the trade secret owner by a person who:

---

[45] Generally speaking, HQ does not appear to dispute the reasonableness of Baxter's attempts to maintain the confidentiality of its trade secret information.  Rather, HQ challenges whether the information identified by Baxter constitutes a trade secret in the first place.  (See generally HQ's Br.)  However, even if HQ challenged Baxter's efforts towards ensuring secrecy, Baxter's submissions demonstrate genuine factual issues on the reasonableness of its precautions relative to confidential information.  (See Chaubal Dec. at ¶¶ 17-24 (describing, at length, Baxter's general efforts towards protecting its confidential information).)

[46] Improper means include "the theft, bribery, misrepresentation, breach or inducement of a breach of an express or implied duty to maintain the secrecy of, or to limit the use or disclosure of, a trade secret, or espionage through electronic or other means, access that is unauthorized or exceeds the scope of authorization, or other means that violate a person's rights under the laws of this State."  N.J.S.A. § 56:15-2.  Proper means (i.e., lawful acquisition), by contrast, include "discovery by independent invention, discovery by reverse engineering, discovery under a license from the owner of the trade secret, observation of the information in public use or on public display, obtaining the trade secret from published literature, or discovery or observation by any other means that is not improper."  Id.

(a) Used improper means to acquire knowledge of the trade secret; or

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived or acquired through improper means; or

(c) Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired through improper means.

See N.J.S.A. § 56:15-2.  Stated differently, Baxter can succeed on its misappropriation claim only if it proves that HQ used Baxter's "trade secrets," without Baxter's consent, and either (i) at the time of such use, "knew or had reason to know" that Mr. Owoo acquired the trade secrets "through improper means;" or (ii) "before a material change of position," "knew or had reason to know" that the information consisted of a trade secret and "that knowledge of it had been acquired through improper means." Id. (emphases added).  Thus, the Court must consider whether the factual record creates genuine issues on (1) whether Mr. Owoo developed HQ's esmolol product using information that qualifies as Baxter's trade secrets, and (2) whether HQ knew or had reason to know that Mr. Owoo obtained the trade secrets by improper means.  The Court will address each issue in turn.

      **a.** **Genuine factual issues preclude a finding**
           **that Baxter's "trade secrets" constitute**
           **public information**

In any trade secret case, the Court must first determine whether there exists, in fact, a trade secret.  See Merckle GmbH v. Johnson & Johnson, 961 F. Supp. 721, 730 (D.N.J. 1997) (citations omitted).  The subject matter of a particular trade secret, however, must be secret.  See id.  In other words, "'[m]atters of public knowledge'" or information "'completely disclosed by [marketed] goods'" cannot qualify as trade secrets. Id. (citation omitted).

In this instance, Baxter argues that HQ's proposed product rests upon three basic "trade secrets:"[47] (1) its "confidential"

---

[47] HQ takes exception with the timeliness of Baxter's identification of the trade secrets alleged to be misappropriated, on account of the fact that Baxter did not specifically identify the "Baxter documents alleged to constitute trade secrets" until its March 4, 2015 supplemental interrogatory responses.  (HQ's Br. at 22-23; see also HQ's Reply at 4-5.)  Generally speaking, a plaintiff in a misappropriation of trade secrets case must provide in its complaint a "description" of the disputed trade secrets sufficient to "'(a) put the defendant on notice of the nature of [the] plaintiff's claims and (b) [to] enable the defendant to determine the relevancy of any requested discovery concerning its trade secrets.'"  PTT, LLC v. Gimme Games, No. 13-7161, 2014 WL 5798148, at *6 (D.N.J. Nov. 6, 2014) (quoting Givaudan Fragrances Corp. v. Krivida, No. 08-4409, 2013 WL 5781183, at *5 (D.N.J. Oct. 25, 2013), appeal dismissed (Dec. 20, 2013)). Baxter asserted its trade secret claim, for the first time, in connection with its June 20, 2014 Amended Complaint, at which time it made plain its position that HQ's esmolol product rested upon "trade secrets" exposed to Mr. Owoo during his tenure, including "formulation research and research reports, product test methods," and "product stability profile[s]."  (Am. Compl.

formulation 4 and its related shelf-life stability
specifications for the main esmolol degradant; (2) its
"confidential" and internal "testing protocols" for determining
the concentration of degradants in esmolol formulations
(hereinafter, the "HPLC protocols"); (3) and its "confidential"
osmolality measurements.[48] (Ex. X to Kelly Dec. at 19, 22-24; see
also Baxter's Opp'n at 15-17; Baxter's Supp. SMF at ¶¶ 75-85;
Clementi Rep. at ¶¶ 47-71.)  Secrecy constitutes a
quintessential question of fact, and the parties here vigorously

---

at ¶ 76.)  Although Baxter waited until months later to identify
the claimed trade secret information with greater precision, the
sequencing of the disclosure, standing alone, fails to warrant
summary judgment.  This more precise disclosure occurred 2
months before the end of the discovery period and 6 months
before HQ filed the present motion, and HQ has not sought, nor
would it be entitled to, an enlargement of the period for
discovery regarding these trade secrets.  The lack of clarity in
Baxter's "trade secret" disclosures has, however, needlessly
complicated the Court's review of the pending submissions.
[48] The Court finds Baxter's claim of trade secrecy over its
osmolality measurements unsupportable.  Indeed, HQ performed its
own osmolality measurements based upon Baxter's publicly
available "ampule formulation" for the express purpose of
avoiding reliance upon any tests performed by Baxter.  (Ex. C to
Kelly Dec. (explaining that HQ obtained the ampule formulation
and performed its own osmolality analysis).)  Given these
circumstances, Baxter cannot legitimately claim trade secrecy
protection over its osmolality measurements, see N.J.S.A. §
56:15-2 (explaining that a "trade secret" must not "be[] readily
ascertainable by proper means"), much less that HQ acquired
and/or used this information by improper means.  See id.
(describing proper means to include "discovery by independent
invention, discovery by reverse engineering," and/or
"observation of information in public use or on public
display").  To the contrary, HQ obtained its own osmolality
measurements through plainly proper means—e.g., through tests
run by its own researchers.

dispute whether the information identified by Baxter sufficient qualifies.

Indeed, as to the formulation and stability expectations, HQ claims that its esmolol formulation (the composition equally embodied in formulation 4) simply mirrors the "original esmolol formulation" published by Baxter in 1986. (HQ's Br. at 11.) In other words, HQ submits that Baxter's Study No. 47192 (at least in terms of formulation 4) did little more than recycle its long-known formulation. (See generally id.) Baxter, by contrast, states that its "original esmolol formulation" bears little resemblance to HQ's formulation, because Baxter prepared it aseptically (rather than through autoclaving), and because "no evidence" suggests that the original esmolol form would have a shelf life and a degradant profile equivalent to that claimed in HQ's invention (and allegedly derived from Baxter's formulation 4 and the results of Study No. 47192). (Baxter's Opp'n at 15-16.)

Even a cursory inspection of Baxter's (partially illegible) product labels reveals that its early esmolol concentrate consisted of the same concentration of esmolol, propylene glycol, and ethanol found in HQ's ready-to-use product. (Compare Ex. U to Kelly Dec. at 4-5 (HQ's NDA), with Exs. T, U, & V to Kelly Dec. (Baxter's labeling information).)

███████████████████████████████████



)  In view
of this record evidence, the Court cannot conclude, as a matter
of law, that Baxter published its esmolol formulation (or its
information regarding stability and shelf-life) in a manner
sufficient to destroy Baxter's claimed trade secrecy.  <u>See</u>
<u>Merckle GmbH</u>, 961 F. Supp. at 731-32 (denying summary judgment
on the issue of trade secrecy).

Nor can the Court conclude that Baxter's public disclosures of its HPLC protocols unquestionably provided sufficient public knowledge of its analytical technique to deprive it, on summary judgment, of the protection of trade secrecy.  Indeed, although Baxter plainly published an abstract that disclosed the broad contours of Baxter's HPLC protocols (see Ex. Z to Kelly Dec.), there is evidence from Baxter's pharmaceutical development expert, Mr. Clementi, that explains why the abstract's "scant details" and its "numerous differences" from Baxter's HPLC method prove inadequate to uncover the exact specifications of Baxter's technique.[50]  (Clementi Rep. at ¶¶ 70-71.)  The Court cannot resolve this genuinely disputed evidence (and the credibility of the parties' affiants) in the context of summary judgment.

In sum, given the parties' genuinely conflicting accounts, the ultimate determination of the existence of trade secrets must be reserved for the factfinder.

_____

[50] Moreover, although HQ claims that it has now developed its own "analytical procedure" and "will not use the Baxter technique" (see HQ's Br. at 14), it could still arguably be charged with having acquired Baxter's trade secrets, even in the face of its own decision to disavow any reliance upon Baxter's method.  See N.J.S.A. § 56:15-2 (explaining that misappropriation includes acquisition of a trade secret).

> **b. Genuine factual issues exist on whether HQ had Reason to Know that Mr. Owoo obtained Baxter's claimed "trade secrets" by Improper Means**

Even if this information qualified as trade secrets, Baxter must still demonstrate that HQ knew or had reason to know that Mr. Owoo obtained this information through improper means. Baxter's argument on this issue proves simple: it claims that HQ "'st[u]ck its head in the sand'" and "knowingly engaged in an employee intimately involved with Baxter's esmolol products to create a competing version of Baxter's commercial product." (Baxter's Opp'n at 22-24.)  In other words, Baxter takes the position that genuinely disputed evidence suggests that HQ plainly had reason to know that Baxter's trade secret information formed the fabric of Mr. Owoo's "fully formed" esmolol concept.[51]  (Id.)

The Court agrees.  Indeed, there is evidence that HQ knew of Mr. Owoo's involvement in esmolol formulations while at Baxter (through Mr. Richard), that it knew that Mr. Owoo proposed a late-stage esmolol product (also through Mr. Richard), and that it knew that HQ had no such esmolol development effort of its own before Mr. Owoo came from Baxter. In view of this, the Court finds at least circumstantial

---

[51] That there is no evidence that HQ actually knew of the existence of Mr. Owoo's Severance and Employment Agreements with Baxter was established in Part IV.A, supra.  The inquiry here is whether HQ had reason to know of Mr. Owoo's restrictions on disclosure of Baxter's trade secrets.

evidence from which a factfinder could conclude that Baxter had reason to know that Mr. Owoo may have accessed (and relied upon) trade-secret information obtained through improper means. Indeed, HQ appears to have inquired into Mr. Owoo's contractual obligations to Baxter for precisely that reason.  Whether HQ had reason to know that Mr. Owoo was using trade secrets from Baxter, protected as such, in his proposal to and employment by HQ, remains to be determined at trial.  If HQ was willfully blind to the circumstances indicating Mr. Owoo's improper use of Baxter's trade secrets, HQ may be liable for misappropriation. The Court, however, cannot resolve these disputed issues in the context of the pending motion of summary judgment.

For all of these reasons, HQ's motion for summary judgment on Baxter's misappropriation claim will be denied.

### C.   Admissible Evidence May Establish a Prima Facie Case for HQ's Unjust Enrichment and/or Unfair Competition Claims

Baxter premises its claims for unjust enrichment and unfair competition (Counts VI & VII), upon its position that HQ tortiously interfered into Baxter's affairs and misappropriated its trade secrets.  (See Second Am. Compl. at ¶¶ 103-139.)  In other words, these claims depend upon a finding of liability in favor of Baxter on its tortious interference and misappropriation claims.  (See Baxter's Opp'n at 26-30.) Because the Court has found factual issues on Baxter's

misappropriation claim (i.e., the conduct partially underpinning these additional claims), HQ's motion for summary judgment must be denied on these counts as well.[52]

> ### D. Admissible Evidence May Establish a Prima Facie Case for Baxter's claims for Correction of Inventorship and to Quiet Title to HQ's Patents

In its final claims for correction of inventorship and to quiet title, Baxter seeks declarations (1) removing Erica Castagna as an inventor on the '505 and '054 patents, HQ's esmolol patents, and (2) deeming Baxter "the true titleholder of the '505 and '054 Patents," because Mr. Owoo allegedly conceived of the invention embodied in HQ's patents while at Baxter (thereby making Ms. Castagna's role insignificant), and because he contractually assigned all such inventions to Baxter (affording it a claim to ownership). (Second Am. Compl. at ¶¶ 115-139.) In support of these claims, Baxter points to the evidence that Mr. Owoo brought HQ a "fully formed" product upon his departure from Baxter, and to the evidence that HQ listed Ms. Castagna as an inventor only as a courtesy. (See, e.g., Baxter's Supp. SMF at ¶¶ 47-48, 61-75.) HQ, by contrast, takes

---

[52] Moreover, although these claims appear to find their root in Baxter's misappropriation claim, the Court cannot conclude, upon this record, that they duplicate the misappropriation claim to the extent necessary for dismissal. Nor can the Court dispense with the possibility that these equitable claims arguably encompass more conduct than the misappropriation claims. For these reasons too, the Court finds summary judgment inappropriate.

the position that Mr. Owoo and Ms. Castagna conceived of its invention in 2012, long after Mr. Owoo's departure from Baxter. (See HQ's Br. at 29-34.)

The Court, however, need not belabor the parties' positions, because genuine factual disputes plainly preclude a finding in HQ's favor. Indeed, Mr. Owoo's presentment of his esmolol proposal to HQ less than a month after his Baxter termination, standing alone, creates a reasonable inference that Mr. Owoo conceived of his esmolol proposal while at Baxter, and HQ's own records permit the inference that it named Ms. Castagna an inventor mostly as a courtesy (and not necessarily because she conceived of the esmolol formulation embodied in HQ's patents). (See Exs. B, D, E to Kelly Dec.; Ex. 29 to Gallo Dec.; Squeglia Dep. at 174:23-175:2.) Even more, no party challenges the fact that Mr. Owoo contractually assigned to Baxter his rights to any invention "conceived or reduced to practice by" him, during his employment with Baxter or within 120 days following his termination. (Ex. 6 to Gallo Dec. at ¶ 7.) Mr. Owoo's proposed esmolol formulation was disclosed to HQ well within this 120-day period. The Court cannot resolve these genuinely disputed factual issues in the context of summary judgment. As a result, HQ's motion for summary judgment on these claims will be denied.

43

**V.    CONCLUSION**

For all of these reasons, the Court finds that the undisputed facts demonstrate HQ's entitlement to judgment as a matter of law on Baxter's state law tort claims for tortious interference (Counts III to IV), but concludes that genuine factual issues preclude the summary disposition of Baxter's misappropriation of trade secrets, unjust enrichment, unfair competition, and inventorship claims (Counts V to IX).  The foregoing Opinion is a redacted version of the sealed Opinion filed on January 19, 2016.


      **January 26, 2016**                     **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          Chief U.S. District Judge

44